ESTATE OF NATHANIEL SANDLER, Deceased, LILLIAN SANDLER, Administratrix, and LILLIAN SANDLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Sandler v. Commissioner
Docket No. 4268-72.
United States Tax Court
T.C. Memo 1979-229; 1979 Tax Ct. Memo LEXIS 293; 38 T.C.M. (CCH) 915; T.C.M. (RIA) 79229; June 12, 1979, Filed *293 (1) The Commissioner recomputed H and W's income for 1968 and 1969 using the bank deposits method. Such method revealed that H and W had unexplained bank deposits, and based thereon, the Commissioner determined deficiencies. Held, such bank deposits were made from a cash hoard accumulated by H in prior years and did not represent unreported income of H and W during the years in issue. (2) The Commissioner also determined that H had unreported interest income in 1968 and that the underpayments of tax for 1968 and 1969 by H and W were due to negligence or intentional disregard of the rules and regulations for reporting income. Sec. 6653(a), I.R.C. 1954. H has agreed that the interest income was omitted. Held, the Commissioner's determination is sustained as to H's failure to report interest income during 1968. Leonard Bailin, for the petitioners. William F. Halley, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Addition
Sec. 6653(a)
Year
Petitioner
Deficiency
I.R.C. 1954 [1]
1968
Estate of Nathaniel Sandler,
$73,791.00
$3,699.00
Deceased, Lillian Sandler,
Administratrix
1969
Estate of Nathaniel Sandler,
10,227.00
511.00
Deceased, Lillian Sandler,
Administratrix, and
Lillian Sandler
*294 The issues for decision are: (1) Whether certain bank deposits by Dr. Sandler in 1968 and 1969 represent unreported income in those years; and (2) whether any part of the underpayment of taxes was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petition in this case was filed by Nathaniel Sandler, now deceased, and Lillian Sandler, husband and wife, who maintained their legal residence in Brooklyn, N. Y., at the time they filed such petition. Dr. Sandler filed his individual Federal income tax return for 1968 with the District Director of Internal Revenue, Brooklyn, N. Y. Dr. Sandler and Mrs. Sandler filed their joint Federal income tax return for 1969 with the District Director of Internal Revenue, Brooklyn, N. Y. Dr. Sandler died on July 13, 1972, after filing the petition in this case; Mrs. Sandler has been appointed administratrix of his estate, and the estate has been substituted as a party to these proceedings. *295 Dr. Sandler was first licensed to practice medicine in 1925. During the 1920s and 1930s, he specialized in proctology and had an active practice. His office was located on the ground floor of his house in the Williamsburgh section of Brooklyn.Dr. Sandler owned the house and lived and maintained his medical office there throughout the years in issue. Dr. Sandler had two sons, Frank and Gilbert, by his first wife, Rae L. Sandler. In 1937, his older son Frank was killed on a camping trip. Dr. Sandler never fully recovered from the trauma of his son's death, and from that time on, he continued his medical practice in a limited manner. He did not take any new patients, and he changed his practice to a more general, family practice. In 1955, Dr. Sandler partially retired from practice. He no longer cared for patients in the hospital, but he did continue to see his old patients at his office. When Dr. Sandler first began his practice in Williamsburgh, the neighborhood was attractive and safe; but since the middle Fifties, the neighborhood has deteriorated, and it has become unsafe. In the mid-Fifties, his wife Rae became ill, and Dr. Sandler stayed at home to care for her. *296 She had a leg amputated in 1964 as a result of her illness, and she subsequently died in April of that year. She had been hospitalized at least two or three times prior to her death.
Dr. Sandler married Lillian Sandler in November 1964. She was 49 years old at the time; he was 70 years old. He suffered from a bronchial condition and arthritis, and he walked with a cane. He was also a diabetic. During 1967, Dr. Sandler's leg became ulcerated in the area between the knee and the ankle. This ulcerated condition continued through the years, and he also developed ulcerated sores on his arms and other parts of his legs. When he died in 1972, the cause of his death was recorded as diabetes, arteriosclerosis, and a staph infection. During 1964 through 1966, Dr. Sandler received $46,170.49 from the following sources: Source
Amount
Redemption of certificate of
$ 3,038.77
deposit in Equitable Life
Assurance Society of the
United States
Surrender of Metropolitan Life
Insurance Co. policy
23,221.24
Surrender of Maccabees Mutual
Life Insurance Co. policy
1,160.50
Redemption of Series E. bonds
3,727.08
Closing of account in Dime Savings
7,802.18
Bank of Williamsburgh in the names
of Nathaniel H. Sandler and Rae
L. Sandler
Closing of account in Lincoln Savings
7,220.72
Bank of Brooklyn in the names of
Nathaniel H. Sandler and Rae L.
Sandler
*297 In December 1967, Dr. and Mrs. Sandler were robbed at gunpoint in their home. Three robbers went through their house, took various articles, and took money from Dr. Sandler. There were no other occupants of the house at the time of the robbery. Dr. Sandler reported this robbery to the police, but the thieves were not apprehended. The Sandlers' home was burglarized again in 1968 and again in 1969.These burglaries were also reported to the police. In 1968, Dr. Sandler kept a diary which contained 659 names of individuals. The number 10 was written next to each name. At that time, Dr. Sandler did not visit patients in their homes, and he saw no medicare or medicaid patients. He did not employ anyone to assist him in his office during the years in issue, and he had no partners. Dr. Sandler's son, Gilbert, is also a medical doctor, but his son never practiced with him. During 1968 and 1969, Dr. Sandler deposited a total of $160,442 into 14 different bank accounts. All of such accounts were held jointly by Dr. and Mrs. Sandler. With one exception, such banks were located in the general vicinity of his home. Since Dr. Sandler's mobility was limited at this time, either Mrs. *298 Sandler or a family friend drove him to the bank whenever he made a deposit into any of these accounts. At least $25,300 of the deposits were made in cash. The following schedule represents all the deposits made by Dr. Sandler in savings accounts during 1968 and 1969: Date of
Deposit
Account
Amount
1968
1/22
Williamsburgh Savings Bank $ 5,000.00
1/23
Lincoln Savings Bank
5,000.00
1/23
Dry Dock Savings Bank
5,000.00
1/23
United Mutual Savings Bank
account 151,026
5,000.00
1/24
Dime Savings Bank of Williamsburgh
1,000.00
1/26
Bowery Savings Bank
300.00
3/27
Bowery Savings Bank
11,000.00
3/28
Anchor Savings Bank
11,500.00
3/29
Prudential Savings Bank
11,000.00
4/1
Green Point Savings Bank
11,500.00
4/2
Metropolitan Savings Bank
15,000.00
4/4
Hamburg Savings Bank
15,000.00
4/8
Dry Dock Savings Bank
5,000.00
9/17
United Mutual Savings Bank
account B83421
14,000.00
Total 1968 deposits
$115,300.00
1969
3/11
Dime Savings Bank of Williamsburgh
7,370.00
3/11
Williamsburgh Savings Bank
5,000.00
3/11
United Mutual Savings Bank
account 151,026
2,140.00
4/22
Anchor Savings Bank
10,000.00
7/25
Hamburg Savings Bank
200.00
7/29
Dry Dock Savings Bank
100.00
7/29
United Mutual Savings Bank
account B83421
100.00
7/29
Bowery Savings Bank
100.00
Total 1969 deposits
$ 25,010.00
*299 In a checking account at the Manufacturers Hanover Trust Company, Dr. Sandler also deposited $6,912.00 in 1968 and $13,220.00 in 1969. In 1968, Dr. and Mrs. Sandler received $9,459.36 as interest on their savings accounts. On his individual Federal income tax return for 1968, Dr. Sandler reported gross receipts of $6,150.00 from his medical practice, but he reported no interest income during such year. On her individual Federal income tax return for 1968, Mrs. Sandler reported interest income of $3,469.95, including $2,018.79 of the interest received by her and Dr. Sandler on their jointly held savings accounts. On their joint Federal income tax return for 1969, Dr. and Mrs. Sandler reported gross receipts of $6,080.00 from his medical practice and $13,258.16 as interest income for 1969. In his notice of deficiency to Dr. Sandler, the Commissioner determined that $110,000 of the 1968 deposits in the joint savings accounts represented unreported income to Dr. Sandler for such year. In the notice, he also determined that $7,123.42 in interest for such year was not reported by Dr. Sandler. In his amendment to answer, the Commissioner now asserts that $7,440.97 is the correct *300 amount of unreported interest income for 1968. In his notice of deficiency to Dr. and Mrs. Sandler, the Commissioner determined that $22,770.00 of the deposits during 1969 in their joint savings accounts represented unreported income to them in such year. The Commissioner has not treated the deposits in the checking account in the Manufacturers,Hanover Trust Company in 1968 and 1969 as unreported income. The Commissioner also determined that the petitioners are liable for the 5-percent addition to tax for 1968 and 1969 under section 6653(a) due to negligence or intentional disregard of rules and regulations. OPINION The first issue for decision is whether the bank deposits made by Dr. Sandler during 1968 and 1969 represent unreported income in such years. The use of the bank deposits method has long been sanctioned by the courts as a method of reconstructing income. See, e.g., Goe v. Commissioner,198 F. 2d 851 (3d Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 344 U.S. 897 (1952); Halle v. Commissioner,175 F. 2d 500 (2d Cir. 1949) affg. 7 T.C. 245 (1946), cert. denied 338 U.S. 949 (1950); *301 Mauch v. Commissioner,113 F. 2d 555 (3d Cir. 1940), affg. 35 B.T.A. 617 (1937); Oliver v. United States,54 F. 2d 48 (7th Cir. 1931), cert. denied 285 U.S. 543 (1932). It is a well established principle that the Commissioner's deficiency determination is presumptively correct and that the petitioner has the burden of proving otherwise. Rule 142, Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). A deficiency determination based on the bank deposits method of reconstructing income is entitled to such presumption, and the petitioner bears the burden of proving that such determination is incorrect. Armes v. Commissioner,448 F. 2d 972 (5th Cir. 1971), revg. on other issues a Memorandum Opinion of this Court; Estate of Mason v. Commissioner,64 T.C. 651, 656-657 (1975), affd. 556 F. 2d 2 (6th Cir. 1977); Jones v. Commissioner,29 T.C. 601 (1957). The petitioners contend that the deposits in the savings accounts in 1968 and 1969 resulted from a cash hoard accumulated by Dr. Sandler in the years preceding 1968. *302 They argue that Dr. Sandler was 74 years old in 1968, in poor health, and had been retired from an active practice since 1955, and that therefore, in 1968 and 1969, he could not have earned the $132,770 which was deposited in the savings accounts during such years, and which the Commissioner claims was unreported income. They contend that the large amount deposited during the first few months of 1968, and the frequency of the deposits, support their position that such deposits could not represent income earned by a man in Dr. Sandler's condition. After a careful review of all the facts and circumstances, we agree with the petitioners. A most telling factor in support of the petitioners' position is that of the total $115,300 deposited by Dr. Sandler in the savings accounts during 1968, $101,300 was deposited between January 22 and April 8--a period of 11 weeks. Yet, the Commissioner conceded that Dr. Sandler had been partially retired since 1955. Mrs. Sandler testified that, during the years in issue, Dr. Sandler did not make house calls, he did not see any new patients, and he took no medicare or medicaid patients, and her testimony is wholly consistent with the other evidence *303 in the record. The record also indicates that he was 74 years old in 1968 and that he was in relatively poor health, suffering from arthritis, a bronchial condition, diabetes, and an ulcerated leg. His mobility was limited, and he walked with a cane. This evidence convinces us beyond a doubt that Dr. Sandler could not have earned over $100,000 from the practice of medicine in a period of 11 weeks in 1968. We observe that before the years in issue, Dr. Sandler had a successful medical practice, providing him with a likely source for a cash hoard. He owned the house in which he lived and maintained his office. Approximately 2 years before the years in issue, Dr. Sandler acquired $46,170.49 when he surrendered two life insurance policies, a certificate of deposit, and a number of Series E savings bonds and closed two savings accounts. Such cash could have been the source of some of the total deposits. When such cash is subtracted from the total unexplained deposits, it leaves only $86,599.51 of unexplained deposits, and such amount could easily have been accumulated by a doctor in practice for over 40 years. Also, it is reasonable to infer that the robbery that occurred at Dr. *304 Sandler's home in December 1967 may have prompted him to deposit the cash he had on hand at his home. Mrs. Sandler testified that Dr. Sandler made all such deposits in cash and that he carried the cash in his doctor's bag. She also admitted that she did not know where he kept the cash and that she never searched for such cash. Nevertheless, the deposit slips show that at least $25,300 of the deposits during the years in issue were indeed made in cash. Such evidence supports Mrs. Sandler's testimony about the nature of the deposits. We can also understand that Dr. Sandler might wish to hide a secret cash hoard from his wife. Mrs. Sandler was his second wife and approximately 21 years his junior. He married her when he was at an advanced age, and he may have been reluctant to inform her of his bounty. We do not place substantial weight on Dr. Sandler's diary for 1968 because of the uncertainty as to how it was maintained by him, but the total of 659 entries does correspond with the amount of income from his medical practice reported by him for such year.Moreover, we observe that he reported similar gross receipts in 2 previous years--$6,740.50 in 1965 and $6,450.00 in 1966.He *305 also reported similar gross receipts of $6,080.00 in 1969. There is nothing in the record to suggest that Dr. Sandler may have been engaged in any illegal activity productive of income, and the amounts reported by him are altogether consistent with his very limited practice of medicine. The second issue for consideration is whether Dr. Sandler had unreported interest income in 1968 from his savings accounts held jointly with Mrs. Sandler. The parties stipulated that Dr. and Mrs. Sandler earned total interest of $9,459.36 during 1968 from such joint accounts. Mrs. Sandler reported $2,018.79 of such interest in 1968. In his notice of deficiency, the Commissioner determined that Dr. Sandler had unreported interest income of $7,123.42, but in view of the stipulation by the parties, he now claims that Dr. Sandler had $7,440.97 of unreported interest income in that year. In view of that situation, the burden of proof on this issue is divided: it is the petitioners' burden as to the amount set forth in the notice, but the Commissioner has the burden as to the additional amount claimed in his amendment to answer. In their petition, the petitioners challenged the Commissioner's determination. *306 However, at the trial and in their briefs, they did not offer any evidence or objections to the Commissioner's determination with respect to interest, and indeed, in their reply brief, they expressly agreed to such determination. Accordingly, we sustain the Commissioner's determination in this respect and hold that Dr. Sandler received $7,440.97 of unreported interest in 1968. The last issue for consideration is whether the petitioners are liable for the additions to tax under section 6653(a) for negligence or for intentional disregard of rules and regulations. [2] The petitioners have the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757 (1972); Inter-American Life Insurance Co. v. Commissioner,56 T.C. 497 (1971), affd. per curiam 469 F. 2d 697 (9th Cir. 1972); Rosano v. Commissioner,46 T.C. 681 (1966). Since we have held that the deposits in the petitioners' accounts during 1968 and 1969 were not income earned during such years, we consider only whether Dr. Sandler's failure to report interest income from his bank accounts during 1968 was due to negligence or to intentional disregard of rules and *307 regulations within the meaning of section 6653(a). The petitioners presented no evidence during the trial of this case regarding such issue, nor did they address the issue on brief. Mrs. Sandler reported part of the interest earned from their joint accounts in 1968 on her Federal income tax return for such year, but the petitioners have offered no explanation why Dr. Sandler did not report any interest income on his return. Accordingly, we sustain the Commissioner's determination with respect to the addition to tax under section 6653(a) for Dr. Sandler's failure to report interest income during 1968. In conclusion, we hold that the deposits made by Dr. Sandler during 1968 and 1969 do not represent unreported income during such years, that Dr. Sandler had unreported interest income of $7,440.97 for 1968, and that his estate is liable for the *308 section 6653(a) addition to tax for the failure to report such interest. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. In relevant part, sec. 6653(a) provides: If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩